UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

TERRY WATSON as Administrator of the Estate
of Antwan Cater,

<em>Plaintiff</em>,

No. 9:25-cv-1601 (AJB/DJS)

-*against*-

ONEIDA COUNTY; NEW YORK CORRECT
CARE SOLUTIONS MEDICAL SERVICES,
P.C.; WELLPATH LIQUIDATING TRUST;
JASON JOHNSON, R.N.; CONNIE HUBBELL,
R.N.; CELIA GOODWIN, R.N.; NICHOLAS
DUBINA, R.N.; PETER MANNO, R.N.;
CORRECTION OFFICER J. BRACO
DIZDAREVIC; CORRECTION OFFICER
JOSEPH HERRINGSHAW; CORRECTION
OFFICER BRADLEE CHAPMAN;
CORRECTION OFFICER BARRY BRAY; and
CORRECTION OFFICER JASON SILIPO.

<em>Defendants</em>.

Plaintiff Terry Watson as Administrator of the Estate of his son, Antwan Cater, by and through his attorneys, Emery Celli Brinckerhoff Abady Ward & Maazel LLP, for his Complaint, alleges as follows:

<strong><u>PRELIMINARY STATEMENT</u></strong>

1.      This is a civil rights and wrongful death action brought on behalf of the estate of 25-year-old Antwan Cater, who died on February 13, 2024 at the Oneida County Correctional Facility ("OCCF"), a county jail in Oriskany, New York. After he experienced a seizure that day, Antwan died on the floor of his cell while OCCF Correction Officers and nurses stood idly by and failed to promptly render emergency medical assistance.

2.      Antwan's brief pre-trial confinement at OCCF for a non-violent, low-level offense should never have ended with his death. On December 28, 2023, Antwan was arrested

for shoplifting from a Wal-Mart. After Antwan disclosed his history of substance use and that he had recently experienced a drug-induced seizure, a judge ordered that he be released from custody and ordered him to attend substance abuse treatment.

3.        On January 29, 2024, Antwan was arrested again for failing to report to the court-ordered treatment program and booked at OCCF. During his intake, he once again described his history of substance use, including prior synthetic cannabinoid ("K2") use and withdrawal. He was prescribed a detox plan and placed in the jail's Constant Supervision Unit.

4.        Within a few days after his arrival at OCCF, Antwan started refusing medical services and meals, became disoriented and non-verbal, and was seen crying and talking to himself. Correction officers and a nurse observed Antwan hitting his bunk, shaking the gate and crying, jumping naked in his cell, drinking water from the toilet, calling for his parents, and "having [a] mental breakdown." For two weeks, staff at OCCF, including medical staff who evaluated Antwan, did nothing to help him, and instead watched him deteriorate.

5.        On February 13, Antwan was removed from the Constant Supervision Unit and sent to the Medical Infirmary Cell. He had a court appearance scheduled for that same day.

6.        At 12:21 p.m., one Correction Officer reminded Antwan about going to court, but Antwan did not respond and sat on the floor, looking away. At 12:50 p.m. Defendant Correction Officer Braco Dizdarevic conducted a tour and found Antwan lying face up on the floor of his cell, experiencing a seizure. Correction Officer Dizdarevic reported what he saw to the medical unit and then returned to his desk.

7.        More than eight minutes later, Correction Officer Dizdarevic and three other Correction Officers arrived at Antwan's cell to take him to court.

2

8.      The Officers' body-worn camera ("BWC") footage documented what happened next.

9.      Correction Officer Dizdarevic opened Antwan's cell door to let the three other Correction Officers into the cell. They found Antwan lying on his back with his arms and legs spread out, completely unresponsive. Defendant Correction Officer Bradlee Chapman asked, "Antwan, you alive?" and another asked for a nurse to be sent to the cell. The officers then stood around idly in the cell while waiting for the nurse.

10.      At 12:59, a nurse, Defendant Jason Johnson, finally arrived at Antwan's cell, where he found Antwan still lying unresponsive on the floor, not breathing. Instead of immediately starting CPR, Nurse Johnson stood over Antwan and asked: "What's going on with you, dude? *You're not happy in here?* You gotta talk to me. I can't help you if you don't talk to me Antwan." Defendant Correction Officer Jason Silipo called out, "Cater, do you want to go to court?" Antwan did not respond or even move. Another nurse arrived and stood idly by the wall, observing.

11.      For minutes, the medical staff stood around, prodded Antwan, attempted to check his blood pressure, tried to find his heartbeat with a stethoscope, and discussed the situation with the Correction Officers. Finally, at 1:04 p.m., nearly *fifteen minutes* after Correction Officer Dizdarevic first found Antwan lying on the floor experiencing a seizure and *four minutes* after Nurse Johnson first entered the cell and found Antwan lying on the floor, unresponsive and not breathing, a nurse started CPR.

12.      It was too little, too late. The Correction Officers and nurses had squandered precious time. What they should have done was immediately start chest compressions and rescue breathing. Each minute they did nothing to help Antwan, the probability of his survival dropped

3

significantly. By first ignoring Antwan's seizure and then standing around idly for minutes, the Correction Officers and medical staff sealed Antwan's fate.

13.     As Antwan lay dying on the cell floor, OCCF medical staff and correctional staff gathered in his cell, where they made jokes and laughed while standing around Antwan's body as other staff performed CPR. One nurse joked about how exhausting CPR was, how she had "burned a thousand calories" performing CPR on Antwan, and she was "too fat" to do CPR for a long period of time. Another nurse jokingly lamented that they had to continue doing CPR even though Antwan was dead because she did not want to lose her medical license. Another theorized that Antwan must have been from "the strip," an apparent reference to a struggling neighborhood in Utica. Other staff loudly complained about the substandard medical equipment they had, which they described as "shitty," broken, and leaking.

14.     Antwan's death was caused by both the individual OCCF Correction Officers' and nurses' deliberate indifference to Antwan's serious medical needs and Oneida County's custom, policy, or practice of failing to immediately summon medical assistance and start CPR when Correction Officers or nurses discover an incarcerated individual who is unresponsive and not breathing. In its final report into Antwan's death, the Medical Review Board of the New York State Commission on Correction ("COC") found "significant issues with the medical response and resuscitation measures provided to [Antwan]."

15.     Antwan Cater's pain and suffering and tragic death were preventable and needless. Defendants' actions were contrary to law, contrary to sound correctional and medical practice, and contrary to the norms of a civilized society. This Complaint, arising from Antwan's death, seeks to hold Defendants accountable for their violations of Antwan's constitutional rights, and their negligence and medical malpractice.

## PARTIES

16.     Antwan Cater was a citizen of the United States and resided in Oneida County, New York, at the time these events occurred.

17.     Terry Watson is Antwan's father. On February 10, 2025, he was duly appointed administrator of Antwan's estate by the Surrogate's Court, Oneida County.

18.     Defendant Oneida County (the "County") is a municipal corporation that through the Oneida County Sheriff's Office ("OCSO") operates OCCF. OCCF and its parent agency, OCSO, are responsible for the provision of medical and mental health care services to individuals incarcerated at OCCF. The County contracted with New York Correct Care Solutions Medical Services, P.C., and Wellpath LLC to provide such services at OCCF.

19.     Defendant New York Correct Care Solutions Medical Services, P.C. ("NYCCSMS") is a New York professional corporation contracted by the County to provide mental health and medical services at OCCF. On information and belief, NYCCSMS, provided medical and mental health services to prisoners at OCCF. In carrying out its duties, NYCCSMS was required to ensure that the personnel it employed at OCCF complied with all OCCF policies, procedures, directives, and protocols in addition to all relevant local, state, and federal statutes and regulations.

20.     On information and belief, Defendant NYCCSMS is a domestic professional service corporation organized under the laws of the State of New York with its registered agent in New York located in New York, New York.

21.     Defendant Wellpath Liquidating Trust (the "Wellpath Trust") is a legal entity established as part of Wellpath LLC's Chapter 11 bankruptcy reorganization plan. Wellpath LLC provided medical and mental health services to individuals incarcerated at OCCF. The Wellpath

Trust was created to assume and administer assets and liabilities of Wellpath LLC, including wrongful death claims arising from Wellpath LLC's operations prior to bankruptcy. Pursuant to the Order issued by the United States Bankruptcy Court for the Southern District of Texas confirming the Chapter 11 Plan of Reorganization, holders of wrongful death claims may seek determinations of liability with the Wellpath Trust as a nominal party. *See In re Wellpath Holdings, Inc., et al.*, 24-90533, Dkt. 2907 (Bankr. S.D. Tex. Jun. 4, 2025).

22.     On information and belief, at all relevant times hereto, Defendant Jason Johnson was a Registered Nurse employed by NYCCSMS and Wellpath LLC and assigned to OCCF.

23.     On information and belief, at all relevant times hereto, Defendant Connie Hubbell was a Registered Nurse employed by NYCCSMS and Wellpath LLC and assigned to OCCF.

24.     On information and belief, at all relevant times hereto, Defendant Celia Goodwin was a Registered Nurse employed by NYCCSMS and Wellpath LLC and assigned to OCCF.

25.     On information and belief, at all relevant times hereto, Defendant Nicholas Dubina was a Registered Nurse employed by NYCCSMS and Wellpath LLC and assigned to OCCF.

26.     On information and belief, at all relevant times hereto, Defendant Peter Manno was a Registered Nurse employed by NYCCSMS and Wellpath LLC and assigned to OCCF.

27.     On information and belief, at all relevant times hereto, Defendants Johnson, Hubbell, Goodwin, Dubina, and Manno (the "Medical Defendants"), were employed by NYCCSMS and Wellpath LLC and were responsible for the medical care of individuals incarcerated at OCCF, and participated in or had knowledge of and failed to intervene in, the denial of adequate medical care to Antwan during his incarceration at OCCF from January 29 to February 13, 2024. The Medical Defendants' duties included but were not limited to caring for

all patients in their assigned areas at OCCF, which included but was not limited to cell visits, physical examinations, identification of acute and chronic conditions, design and implementation of appropriate plans to facilitate care, provision of medications, provision of psychiatric or psychological counseling, coordination of treatment with other providers, provision of emergency medical care, and transfer and discharge planning. At all relevant times hereto, the Medical Defendants were acting under color of state law and within the scope of their capacities as agents, servants, employees, or contracted personnel of the County. Their responsibilities were required to be carried out in a manner consistent with the legal mandates that govern the operation of OCCF, including OCCF policies, procedures, directives, and protocols, in addition to all relevant local, state, and federal statutes and regulations. The Medical Defendants are sued in their individual capacities.

28.　　At all relevant times hereto, Defendant Correction Officer J. Braco Dizdarevic was employed by the County and assigned to OCCF.

29.　　At all relevant times hereto, Defendant Correction Officer Joseph Herringshaw was employed by the County and assigned to OCCF.

30.　　At all relevant times hereto, Defendant Correction Officer Bradlee Chapman was employed by the County and assigned to OCCF.

31.　　At all relevant times hereto, Defendant Correction Officer Barry Bray was employed by the County and assigned to OCCF.

32.　　At all relevant times hereto, Defendant Correction Officer Jason Silipo was employed by the County and assigned to OCCF.

33.　　Defendants Correction Officers Dizdarevic, Herringshaw, Chapman, Bray, and Silipo are referred to collectively herein as the "Correction Officer Defendants."

34.    In May 2025, Plaintiff timely filed a Notice of Claim against the County.

35.    On October 8, 2025, the County conducted an examination of Plaintiff pursuant to New York General Municipal Law § 50-h.

36.    At least 30 days have passed since the Notice of Claim was served on the County, and adjustment and payment thereof has been neglected or refused by the County.

## JURISDICTION AND VENUE

37.    This action arises under the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983, and New York State law.

38.    This Court has subject matter jurisdiction over Plaintiff's federal law claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)-(4) because Plaintiff's claims arise under the laws of the United States, namely 42 U.S.C. § 1983, and seek redress of the deprivation, under color of state law, of rights guaranteed by the Constitution of the United States.

39.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

40.    Venue lies in the Northern District of New York pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

## JURY DEMAND

41.    Plaintiff demands trial by jury in this action.

## STATEMENT OF FACTS

### Antwan Cater

42.    Antwan Cater was born on March 30, 1998. He grew up in Utica, New York. He was 25 years old at the time of his death.

43.    Among his friends and family, Antwan had a reputation as a caring and kind person.

44.    Antwan had a daughter, who was eight years old when Antwan passed. Antwan loved his daughter dearly. She primarily lived with Antwan.



*Antwan Cater and His Daughter*

45.    Antwan also regularly took care of his daughter's younger half-sister. Antwan would take the kids to play in the park or on the trampoline in the backyard, or to play with a tea set in the house.

46.     Antwan had many hobbies and particularly enjoyed bikes and motorbikes, as well as working on electronics, including drones and remote-control cars.

47.     Antwan regularly held jobs around Utica, working at supermarkets and fast-food restaurants, and helping neighbors with yard work.

48.     As a young adult, Antwan experienced chronic psychological issues with a diagnosed anxiety disorder. He also suffered from a chronic neurological condition in the form of seizures.

49.     Antwan also struggled with a substance use disorder.

50.     Less than a year before his death, in April 2023, Antwan went to the emergency room for an apparent drug-induced seizure.

51.     In November 2023, Antwan experienced a second drug-induced seizure.

***Antwan's Acute Medical Needs Are Disclosed Upon His Arrest***

52.     On December 28, 2023, Antwan was arrested for shoplifting children's toys from a Wal-Mart.

53.     On the date of his arrest, Antwan underwent a routine medical screening. Even at this early stage, Antwan's patient profile indicated that he suffered from chronic neurological problems relating to seizures and chronic psychological problems with anxiety disorder. Both conditions were identified as "active" in his summary.

54.     The urinalysis conducted during his December 28, 2023 medical screening indicated the presence of benzodiazepine.

55.     The medical history and physical assessment from the date of his booking noted Antwan's history of seizures and anxiety disorder, and his daily use of K2.

56.    The medical assessment from December 28, 2023 stated that Antwan had a history of substance use and had experienced a "drug induced" seizure within the last month. Antwan himself made this point clear in the medical screening, sharing that "he was in a drug induced psychosis from his drug use[,] this is where seizures started."

57.    Due to concerns about Antwan's substance use, he was released upon arrest to attend treatment, which he struggled to attend.

***Antwan's Medical History Is Again Revealed Upon His Booking at OCCF***

58.    On January 29, 2024, Antwan was re-arrested and booked at OCCF after he failed to report for the court-mandated treatment.

59.    On this date, Antwan again disclosed his active substance use and history of other psychiatric and medical problems.

60.    The OCCF booking report notes "K2 daily, Anxiety, was in St. Elizabeth for drug induced psychosis."

61.    At the time of his booking, Antwan tested positive for both marijuana/THC and benzodiazepine.

62.    On January 29, 2024, Defendant Nurse Jason Johnson conducted Antwan's initial medical assessment.

63.    The initial medical assessment was overseen by Defendant Correction Officer Bradlee Chapman.

64.    The medical assessment indicated Antwan's prior K2 withdrawal, anxiety, and visual disturbances when without K2.

65.    As such, OCCF staff were on notice of Antwan's acute medical condition from the beginning of his time in their custody.

66.     Antwan was prescribed a five-day detox plan, on which he was to take diazepam and meclizine, and placed in the Constant Supervision Unit.

67.     As a result of the initial medical assessment, both Defendant Nurse Johnson and Defendant Correction Officer Chapman were on notice of Antwan's acute medical needs.

68.     Later that evening, at 7:05 p.m., Antwan reported to Correction Officer Jonathan Toscano that he had not slept for two days and started smashing his head into the wall.

69.     On information and belief, Correction Officer Toscano notified other staff, and a mental health referral was completed.

70.     Antwan remained in the Constant Supervision Unit.

***Antwan's Condition Continues to Deteriorate While in the OCCF Constant Supervision Unit***

71.     On the following day, January 30, 2024, Correction Officers' logbooks indicate that Antwan was agitated and disoriented.

72.     On January 31, 2024, Antwan refused medical services.

73.     On February 1, 2024, Antwan refused medical services and refused his dinner.

74.     On February 2, 2024, Antwan's psychological state further deteriorated: Correction Officers reported in their logbook entries that Antwan was found disoriented, non-verbal, and "crying talk to self."

75.     At 8:47 a.m. on February 2, 2024, Defendant Nurse Nicholas Dubina conducted an assessment of Antwan's physical condition.

76.     Defendant Nurse Dubina falsely documented that Antwan had "no anxiety," was "at ease," and was not agitated.

77.     At 3:16 p.m. on February 2, 2024, Defendant Nurse Dubina conducted another assessment of Antwan's physical condition.

78.     Defendant Nurse Dubina falsely documented that Antwan had "no anxiety," was "at ease," and was not agitated.

79.     On February 3, 2024, Antwan's state of distress worsened. Logbook entries from Correction Officers indicated that Antwan was hitting his bunk, shaking the gate and crying, asserting that he was there when his father had died, and "having [a] mental breakdown."

80.     At 8:14 a.m. on February 3, 2024, Defendant Nurse Peter Manno conducted an assessment of Antwan's physical condition.

81.     Defendant Nurse Manno falsely documented that Antwan had "no anxiety," was "at ease," and was not agitated.

82.     At 4:18 p.m. on February 3, 2024, Defendant Nurse Jason Johnson conducted another assessment of Antwan's medical condition.

83.     Defendant Nurse Johnson falsely documented that Antwan had "no anxiety," was "at ease," and was not agitated.

84.     On February 4, 2024, Correction Officers observed Antwan hitting walls, screaming, drinking water out of the toilet, jumping naked in his cell, and calling for his mom and dad through the vent.

85.     Neighboring cellmates told Antwan to kill himself as he continued screaming.

86.     On information and belief, Correction Officers failed to seek mental health treatment for Antwan.

87.     On information and belief, medical staff failed to provide mental health treatment to Antwan.

88.     On February 5, 2024, Antwan underwent a radiology examination to assess pain and trauma in his right hand.

89.    On February 6, 2024, Antwan was observed yelling and talking to himself.

90.    On February 7, 2024, medical staff examined Antwan for a hand injury. The doctor noted that Antwan was confused and that he should continue to be monitored.

91.    On February 8, 2024, Antwan was found "talking to self crying" and again refused to eat.

92.    On February 9, 2024, Antwan was crying, "yelling nonsense," and refused to eat for the second day in a row.

93.    On February 10, 2024, a Correction Officer noted that Antwan was experiencing "loud withdrawals."

94.    Correction Officer Thomas Abounader later described that in the two weeks after Antwan arrived at the Constant Supervision Unit, Antwan never understood instructions and appeared to be in a "psychosis state" when he served Antwan his meals.

95.    In the sixteen days that Antwan spent in the Constant Supervision Unit, he exhibited repeated signs of withdrawal, psychosis, anxiety, and distress.

96.    On information and belief, during the sixteen days that Antwan spent in the Constant Supervision Unit, Correction Officers failed to seek mental health treatment for Antwan.

97.    On information and belief, during the sixteen days that Antwan spent in the Constant Supervision unit, medical staff, including Defendants Nurses Johnson, Dubina, and Manno, failed to provide mental health treatment to Antwan and failed to document his mental health deterioration.

*Antwan Is Transferred to the Medical Infirmary Cell Before His Court Appearance*

98.     At around noon on February 13, 2024, Antwan was transferred from the Constant Supervision Unit to the General Population Medical Infirmary by Correction Officer Thomas Abounader.

99.     Antwan had a court appearance scheduled that day.

100.     When Antwan left his cell in the Constant Supervision Unit, he was unclothed, draped in a blanket, and barefoot.

101.     Antwan walked from the Constant Supervision Unit to the Medical Infirmary while being escorted by Correction Officer Abounader.



*Antwan is escorted from the Constant Supervision Unit to the Medical Infirmary*

102.     When Antwan entered the Medical Infirmary, he walked past Defendant Nurse Johnson, who was seated at a desk.



*Antwan enters the Medical Infirmary*

103.    On information and belief, Antwan did not receive any medical care after he arrived at the Medical Infirmary on February 13, 2024.

104.    Defendant Correction Officer Braco Dizdarevic was the housing unit officer supervising the Medical Infirmary that day.

105.    In the late morning, Defendant Correction Officer Dizdarevic went on break, leaving Defendant Correction Officer Joseph Herringshaw to cover for him as the housing unit officer.

106.    At approximately 12:21 p.m., Defendant Herringshaw spoke to Antwan in his cell about going to court; Antwan did not respond and continued to sit on the floor, looking away from Herringshaw. Herringshaw repeated himself. Antwan looked toward Herringshaw and shook his head.

107. At approximately 12:30 p.m., Defendant Correction Officer Herringshaw documented a housing area watch tour but noted nothing regarding Antwan.

108. At approximately 12:40 p.m., Defendant Herringshaw documented another housing area watch tour. Again, he noted nothing regarding Antwan.

109. At 12:44 p.m., Defendant Officer Dizdarevic returned from break and resumed his post as the housing unit officer.

110. At 12:45 p.m., a Correction Officer obtained a force order to bring Antwan to court by any means necessary.

***Officers Arrive at Antwan's Cell and Find Him in Distress***

111. At 12:50 p.m., Defendant Correction Officer Dizdarevic was conducting a supervisory watch tour when he found Antwan "laying flat on the floor but breathing and turning his head from side to side with his eyes open," having an apparent seizure.

112. Defendant Correction Officer Dizdarevic walked down the hall to the medical unit to report what he had seen.

113. On information and belief, Defendant Nurse Johnson was at the medical unit when Correction Officer Dizdarevic reported Antwan having a seizure.

114. On information and belief, Defendant Nurse Johnson told Defendant Correction Officer Dizdarevic that he would go check on Antwan.

115. Defendant Correction Officer Dizdarevic then returned to his desk without checking on Antwan who, on information and belief, continued to experience a seizure.

116. Defendant Nurse Johnson did not check on Antwan in response to Correction Officer Dizdarevic's 12:50 p.m. report.

117.    Shortly before 12:58 p.m., Defendants Correction Officers Bradlee Chapman, Jason Silipo, and Barry Bray entered the Medical Infirmary with a restraint chair, which they intended to use to remove Antwan from his cell to take him to court.

118.    At 12:58:18,[1] Correction Officer Dizdarevic opened the door to Antwan's cell for Correction Officers Chapman, Bray, and Silipo.

119.    At 12:58:20, Correction Officers Chapman, Bray, and Silipo entered Antwan's cell.

120.    Correction Officer Chapman immediately observed that Antwan was "laying on his back and he did not appear to be moving."

121.    Correction Officer Bray immediately observed that Antwan was "laying on the floor and appeared to be unconscious and unresponsive" but "assume[d] he was breathing."

122.    Antwan was lying on his back, unconscious.



*View from Correction Officer Chapman's BWC depicting Antwan as he appeared when Chapman, Bray, and Silipo entered the cell.*

---

[1] All times indicated the following paragraphs correspond to the timestamps on Correction Officer Chapman's BWC footage.

123.    Defendant Correction Officer Chapman stood over Antwan and called out his name several times.

124.    Defendant Correction Officer Silipo called out "Mr. Cater."

125.    Antwan did not move or respond.

126.    Defendant Correction Officer Chapman bent down, briefly rubbed Antwan's chest, and asked: "you alive?"

127.    Antwan remained unresponsive.

128.    At 12:58:59, Defendant Officer Dizdarevic called out saying, "send JJ down here . . . send Jason down," referring to Defendant Nurse Johnson.

129.    Defendant Nurse Johnson had been one of the medical professionals responsible for Antwan's care over the preceding two weeks.

130.    At 12:59:06, Defendant Correction Officer Chapman requested that someone "grab some smelling salt."

131.    While waiting for Nurse Johnson to arrive, Defendants Correction Officers Chapman, Bray, and Silipo stood around Antwan in the cell.

132.    Defendant Correction Officer Bray leaned on the sink, staring down at Antwan.

133.    Defendant Correction Officer Silipo stood idly near Antwan and then stepped over Antwan's body.

134.    Defendant Correction Officer Chapman bent down to pick up a shirt that was on the floor and tossed it onto the bare bedframe.

135.    As they waited for Nurse Johnson, none of the Correction Officer Defendants provided CPR or any other emergency medical care.

*Antwan Is Denied Critical Medical Care While Experiencing a Seizure and Cardiac Arrest*

136.    At 12:59:48, Defendant Nurse Johnson entered Antwan's cell and Defendant Nurse Connie Hubbell arrived outside the cell door.

137.    Upon their arrival, the two nurses saw Antwan lying motionless on the floor of his cell, face-up, with his eyes closed and his arms and legs spread out.

138.    Defendant Nurse Hubbell observed that Antwan was unresponsive and had vomit on the right side of his head and in his hair.

139.    At 12:59:52, Defendant Nurse Johnson bent down and touched Antwan's toes.

140.    At 13:00:19, Defendants Nurse Johnson, Correction Officer Chapman, Correction Officer Silipo, and Correction Officer Bray stood idly around Antwan inside the cell while Nurse Johnson said: "What's going on with you, dude? You're not happy in here? You gotta talk to me. I can't help you if you don't talk to me Antwan. No?"



*View from Correction Officer Chapman's BWC depicting Nurse Johnson (far left), Correction Officer Silipo (center left), and Correction Officer Bray (far right) standing around Antwan (below bottom frame).*

141.    Antwan did not respond to Nurse Johnson's statements.

142.    At 13:00:22, Defendant Correction Officer Silipo loudly stated: "Cater, do you want to go to court?"

143.    Antwan did not respond to Correction Officer Silipo's question.

144.    Nurse Johnson asked Nurse Hubbell to grab him "vitals and a headlight."

145.    Despite Antwan being incarcerated at OCCF for sixteen days, at 13:00:43, Nurse Johnson asked "this is Antwan, right?" to which Correction Officer Chapman answered "yeah."

146.    Nurse Johnson then asked Antwan "how long have you been in here, man?"

147.    Antwan did not respond to Nurse Johnson's question.

148.    At 13:00:52, Nurse Johnson bent over and lifted Antwan's limp right arm, which fell immediately upon Johnson's release.

149.    Nurse Johnson later reported in a sworn statement that, at this time, he checked for Antwan's carotid pulse and determined that Antwan's "pulse was weak but present" and that he felt Antwan "swallow."

150.    Likewise, Officer Chapman also reported in a sworn statement that, at this time, Nurse Johnson "informed [the officers] that he felt a weak pulse."

151.    For over 30 seconds, Nurse Johnson leaned over Antwan and then stood idly in the cell.

152.    At 13:01:21, Johnson asked the Correction Officers: "How long has he been like this?"

153.    At 13:01:32, Nurse Hubbell reentered and handed Johnson a stethoscope, blood pressure cuff, and pen light.

154.    At 13:01:37, Defendant Nurse Celia Goodwin entered the cell and stood along the wall near the cell door, behind Nurse Hubbell.

155.    At 13:01:40, Nurse Johnson used the pen light to check Antwan's pupillary reflex while Nurse Hubbell stood in the cell, looking down at Antwan.

156.    At 13:01:47, Nurse Johnson exhaled and stated under his breath, "fucking shit."

157.    At 13:01:59, Nurse Johnson placed a blood pressure cuff on Antwan's right arm while Nurse Hubbell placed a pulse oximeter on a finger on Antwan's right hand.

158.    Nurse Hubbell observed that Antwan's hands were cold, and he was not breathing.

159.    Nurse Johnson later reported in his sworn statement that he was "unable to get a pulse" at this time.

160.    At approximately 13:02, Defendant Sgt. Joseph Neve-Rinaldo arrived just outside the open cell door and stated that Antwan "looks okay."

161.    At 13:02:41, Defendant Nurse Johnson told the Correction Officers in the cell to "call a Code 7."

162.    At 13:02:46, Defendant Correction Officer Bray, who was inside the cell, still standing near the cell sink, stepped out to the hallway and asked Defendant Sgt. Neve-Rinaldo, who was still standing near the cell door, to call a Code 7.

163.    Upon hearing Correction Officer Bray's request, Sgt. Rinaldo asked "is it actually? Did he call it?" apparently referring to Nurse Johnson.

164.    At 13:02:50, Nurse Johnson stated: "I can't hear a pulse, I can't hear anything."

165.    Nurse Johnson then pushed his hand on Antwan's abdomen for support while he stood up.

166.    In response to Nurse Johnson's statement that he could not find a pulse, Correction Officer Chapman asked Nurse Johnson: "you got nothing?"

167.    Nurse Johnson answered: "I can't hear anything." He then motioned down toward Antwan and said, "I felt it there, originally," apparently referring to Antwan's pulse.

168.    At 13:03:00, Officer Bray repeated that Rinaldo should call a Code 7.

169.    Sgt. Rinaldo again asked, "who said that?" Officer Bray answered that the nurse called the code.

170.    Sgt. Rinaldo then called a Code 7.

171.    Meanwhile, Nurse Hubbell bent over and felt for Antwan's carotid pulse.

172.    At 13:03:09, Hubbell remarked that she could not feel a pulse.

173.    At 13:03:10, Johnson stated that Antwan's pupil reactivity was "super slow."

174.    At 13:03:13, Nurse Johnson left the cell to obtain an emergency bag.

175.    For the next minute, while Nurse Johnson was gone, Nurses Hubbell and Goodwin bent over Antwan and attempted to find a heartbeat and pulse.

176.    Neither of the two nurses started CPR.



*Nurses Hubbell and Goodwin bending over Antwan and attempting to find a pulse.*

23

177.    When Nurse Johnson returned approximately one minute later at 13:04:04, Hubbell and Goodwin noted that they could not feel a pulse. Nurse Goodwin stated that she could feel "nothing."

178.    At 13:04:10, Nurse Johnson instructed the officers to "call EMS."

179.    At 13:04:18, Nurse Nancy Menter entered the cell and Nurse Johnson asked her "go get a defibrillator." Nurse Menter immediately left the cell.

180.    At 13:04:14, Defendant Nurse Hubbell started chest compressions.

181.    By the time medical staff began chest compressions on Antwan, fifteen minutes had passed since Correction Officer Dizdarevic first found Antwan lying on the floor and experiencing a seizure, and over four minutes had elapsed since Nurse Johnson first observed Antwan unresponsive in the cell.

182.    At 13:04:25, Sgt. Rinaldo asked "did he come in from the street?" Someone in the background responded, "I don't know."

183.    At 13:05:07, a nurse arrived with a portable Automated External Defibrillator ("AED").

184.    At 13:05:30, Nurse Menter instructed the front desk receptionist to "call 911."

185.    At approximately 13:05:41, Nurse Johnson attached the AED electrode pads to Antwan's body.

186.    At 13:06:09, Nurse Hubbell paused chest compressions while the AED analyzed Antwan's cardiac activity. The AED audibly announced "no shock advised," which indicated that Antwan's heart likely was not beating.

187.    At 13:06:20, Nurse Hubbell resumed CPR.

24

188.     At 13:06:06, 13:07:04, and 13:10, Antwan was given three separate doses of Narcan.

189.     Various Correction Officers and nurses took turns administering CPR until 13:44:34.

***OCCF Staff Attitudes Reveal a Shocking Disregard for Antwan's Care***

190.     For nearly 40 minutes while staff took turns administering chest compressions, nurses and Correction Officers made light of the situation, cracked jokes, made inappropriate comments about Antwan, complained about broken and inadequate medical equipment, and made various other statements evincing a total disregard for Antwan's wellbeing.

191.     At 13:06:37, someone asked "I can't remember his name. Cantar, is that who this is? Cantar?" The question was met with silence. A nurse inquired, "What's the guy's last name?" Someone responded "Canter," and was corrected when another staff member said "Cater."

192.     At 13:11, Nurse Menter started inserting an IV line into Antwan's arm. She commented that the IVs "suck."

193.     At 13:16:26, Correction Officer Chapman asked where Antwan came from. Nurse Johnson hypothesized that he probably came from "the strip." Nurse Johnson turned, looked at Chapman, nodded, and said "yeah."

194.     At 13:17, referencing the use of a suction bag, Nurse Barbara Daley said "if you can get it to work . . . I know, they're shitty."

195.     At 13:18, a nurse said, "is there any-fucking-thing that works around here?"

196.     When the outside EMS arrived at the scene at 13:19 and asked what had happened, Sgt. Neve-Rinaldo, standing in the hallway, said he "doesn't really know." Another nurse responded, "dude's dying."

197.    At 13:20, the officers and nurses told the paramedics that they had been administering CPR for 20 to 25 minutes, which was false, as they had been doing CPR for 15 minutes.

198.    When the paramedics asked how recently staff had checked on Antwan, one nurse responded five minutes before, another that it was ten minutes before. Both statements were false.

199.    At 13:31, one nurse asked for a lancet; another passed the lancet to her and said "you gotta hold those real tight, those are the shitty ones," referencing the medical equipment.

200.    At 13:32, when the paramedic asked the staff about Antwan's health history, the nurses responded, "he's new to us," despite Antwan having been in OCCF custody and in Nurse Johnson's care for over two weeks.

201.    At 13:32, the nurses commented on an air leak in the respirator.

202.    At 13:35, less than ten minutes before the paramedic announced Antwan's death, Correction Officers' body-worn cameras captured staff joking and laughing in Antwan's cell.

203.    At 13:42, while standing in the cell near Antwan, one nurse jokingly asked another if she regretted signing up for the shift. The other nurse laughed and replied, "a little bit . . . this is supposed to be a short shift. Real fun." She then checked her watch.

204.    At 13:43, one minute before Antwan's time of death was announced, nurses standing in Antwan's cell near Officer Chapman discussed the CPR. One nurse asked the others: "does this qualify for our education?" Another nurse responded, "sure," and another noted, "this is a good training," which caused multiple nurses to laugh. The same nurse then joked: "I know, I literally just burned a thousand calories." She continued to smile and laugh and then stated: "I was just going to say, I'm too fat for this."

205.    At 13:44, just one minute before CPR was stopped, the nurses chuckled about giving CPR for 45 minutes. There was inaudible conversation and then Nurse Goodwin announced to the group: "he's been down for 45 minutes, he's been down for 45 minutes, stop." Someone responded, "well, we can't stop here." As multiple nurses loudly laughed, Nurse Goodwin put her hands up in the air and said, "no, don't stop yet." A nurse standing near the wall holding an IV bag then smiled and joked: "I like my license, thanks." The other nurses again laughed.

206.    Within one minute, Antwan's time of death was called by the paramedic, at 13:44.

207.    As the paramedic left Antwan's cell, she stopped in the hallway with the Correction Officers. She asked again: "I know you keep a log, does anyone know the last time you did a check and he was breathing and conscious?" Officer Dizdarevic responded that he did the check, and the paramedic asked, "do you know what time that was, that you saw him awake?" Officer Dizdarevic went to collect this information from the computer. Officer Chapman stated that when he entered at 13:00, Antwan wasn't breathing and was on the floor. Officer Chapman stated that he did not check for Antwan's pulse at that time.

***Antwan's Medical Emergency Was Initially Caused by a Drug-Induced Seizure After He Took Drugs While in OCCF Custody***

208.    The medical examiner described Antwan's cause of death as a seizure due to MDMB-4en-PINACA, which was found in the toxicologic analysis of his blood.

209.    MDMB-4en-PINACA is a synthetic cannabinoid, also known as "K2."

210.    Even though OCCF staff were aware of Antwan's daily use of K2 and history of K2 withdrawal, had prescribed him a five-day detox plan, and had placed him in the Constant Supervision Unit, on information and belief, OCCF failed to sufficiently monitor and control the use of K2 by incarcerated people while they were incarcerated at OCCF.

27

*In Their Incident Reports, the Correction Officer Defendants Cover Up Their Failures by Claiming that They Believed Antwan Was Faking His Medical Emergency*

211.    In their subsequent incident reports, the Correction Officer Defendants each stated the same post-hoc explanation for their failure to summon or provide immediate medical assistance to Antwan: they purportedly believed Antwan was faking his seizure to avoid going to court.

212.    Officer Chapman stated in his incident report that upon arriving at Antwan's cell at 12:58 p.m., he "just thought [Antwan] was refusing to talk."

213.    Officer Silipo similarly declared in his incident report that he "thought [Antwan] was refusing to talk to us."

214.    Officer Bray wrote in his incident report that upon entering Antwan's cell at 12:58 p.m., he saw "Cater laying on the floor and appeared to be unconscious and unresponsive. I noticed [Antwan's] tongue and jaw moving. I didn't know if he was playing possum because he didn't want to go [to court]. At that point I had no reason to look to see if his chest was rising. I assumed he was breathing."

215.    Meanwhile, Sgt. Neve-Rinaldo's incident report, which included an investigative summary of the entire incident, significantly downplayed the Correction Officers' and nurses' failure to summon or provide immediate medical assistance to Antwan.

216.    For example, in his incident report, Sgt. Neve-Rinaldo stated that Correction Officer Dizdarevic found Antwan "laying on the floor of his cell" at "around 1255 hours" and "upon seeing this, . . . notified facility medical staff of his findings." According to Sgt. Neve-Rinaldo, "medical staff th[en] entered the unit and assessed [Antwan]."

217.    This statement was false. Medical staff did not go to the unit after Correction Officer Dizdarevic reported that he had found Antwan lying on the cell door. Rather, the BWC

footage shows that Nurse Johnson, the first medical staff member to arrive, first entered

Antwan's unit at 12:59:48, almost two minutes after the Correction Officers arrived at Antwan's

cell to forcibly remove him and take him to court, and nearly ten minutes after Correction

Officer Dizdarevic first reported Antwan's condition to medical staff.

218.     Sgt. Neve-Rinaldo also stated in his incident report that "life saving measures

were *immediately performed* by facility medical [staff]."

219.     This too was false. BWC footage from the incident shows that no life saving

measures, including CPR, were performed until 13:04:14, over four minutes after Nurse Johnson

first arrived in Antwan's cell.

***The Correction Officers' and Nurses' Delay in Summoning and Providing Emergency
Medical Care Caused Antwan's Death***

220.     OCCF staff waited fourteen minutes, from the time Antwan was first observed

having a seizure at 12:50, to administer CPR.

221.     OCCF staff waited over four minutes, from the time Nurse Johnson observed

Antwan lying on the floor, unresponsive and not breathing, to administer CPR.

222.     OCCF staff waited sixteen minutes, from the time Antwan was first observed

having a seizure at 12:50, to administer Narcan.

223.     Basic life support, including chest compressions and rescue breathing, is essential

for a patient experiencing a seizure and exhibiting a weak pulse and shallow breathing.

224.     Basic life support includes three steps, known as the "ABCs of CPR": airway,

breathing, and circulation.

225.     The individual performing CPR must ensure the airway is open by tilting the

person's head back, lifting their chin, and removing any visible obstructions.

226.    The individual performing CPR must check for breathing by looking, listening, and feeling for air on the chest for no more than 10 seconds. If the person is not breathing or is breathing shallowly, rescue breaths must be administered immediately.

227.    The individual performing CPR must check for circulation by checking for a pulse by pressing on the carotid artery on the side of the neck. If there is no pulse or if the pulse is weak, chest compressions must be administered immediately.

228.    Accordingly, when a Correction Officer or nurse observes an individual who is lacking a pulse, has a weak or faint pulse, has no apparent heartbeat from the chest, and/or presents minimal breathing or is not breathing, the proper standard of care is to immediately start CPR.

229.    Upon discovering Antwan unresponsive in his cell, the Correction Officers did not check Antwan's airway, whether Antwan's chest was rising or whether he was breathing, or whether Antwan had a pulse.

230.    Upon discovering Antwan unresponsive in his cell, the Correction Officers did not initiate CPR.

231.    The Medical Defendants also did not immediately start CPR upon discovering Antwan unresponsive and not breathing, and instead waited for over four minutes to start chest compressions.

***The State COC Finds "Significant Issues" with the OCCF Staff "Medical Response and Resuscitation Measures," Including "Significant Delay"***

232.    After reviewing the circumstances of Antwan's death, the COC Medical Review Board "found that there were significant issues with the medical response and resuscitation measures provided to [Antwan]."

233.     Specifically, the COC concluded that "there was a significant delay between when [Antwan] was found unresponsive at 1:00 pm and when EMS was activated at 1:06 pm in order to respond to [Antwan's] medical emergency."

234.     The COC determined that "there was a significant delay of over four minutes by facility medical staff who first observed [Antwan] to be unresponsive and in respiratory failure to beginning of resuscitation measures and another delay of over four minutes of when EMS was requested."

235.     The COC concluded that "[t]here was also a delay in over six minutes to administer Narcan to [Antwan]."

236.     Accordingly, the COC directed Wellpath's Medical Director to "conduct a comprehensive quality assurance review of the emergency response by medical staff and ascertain: Why there was a significant delay in administering resuscitation measures to an unresponsive incarcerated individual in obvious respiratory failure; Why there was a significant delay in activating EMS to the scene for an unresponsive incarcerated individual; [and] Why there was a significant delay in administering Narcan to an unresponsive incarcerated individual."

237.     The COC further determined that OCCF's medical staff were apparently not properly trained to immediately administer resuscitation measures to an unresponsive incarcerated individual in obvious respiratory failure.

238.     Specifically, the COC noted that "medical staff were observed to be unprepared to respond to an unresponsive individual as resuscitation equipment was not brought to the scene until almost five minutes after [Antwan] was found unresponsive."

239.    The COC also directed Wellpath's Medical Director to "initiate a comprehensive retraining of CPR and resuscitation procedures to all medical staff."

***The County's Widespread and Persistent Practice of Failing to Provide Timely Emergency Medical Care to Incarcerated People Experiencing a Medical Emergency***

240.    At the time of Antwan's death, the widespread and persistent practice among OCCF staff, including medical staff employed by Wellpath and OCCF Correction Officers, was to not immediately provide emergency medical care to incarcerated individuals experiencing a medical emergency, including individuals who are unresponsive, unconscious, experiencing a drug overdose, in respiratory failure, or experiencing cardiac arrest.

241.    Prior to Antwan's death, the County had notice of OCCF staff's, including Wellpath's OCCF medical staff's, widespread and persistent practice of failing to timely provide emergency medical care.

242.    For example, on April 27, 2023, less than one year before Antwan's death, Milik Burnett, a 25-year-old, died of an accidental fentanyl drug overdose in OCCF custody after OCCF failed to respond to his medical emergency.

243.    According to the COC's investigation into Burnett's death, OCCF Correction Officers "failed to properly conduct housing area supervision tours" at 7:00 a.m. and 7:30 a.m. and, as a result, when Burnett overdosed on fentanyl and began experiencing a medical emergency, OCCF staff failed to provide necessary immediate emergency medical treatment.

244.    When an OCCF Correction Officer eventually conducted a supervisory watch tour at approximately 8:00 a.m., he discovered Burnett laying on his bunk, choking on foam coming from his mouth. Burnett "did not appear to be fully conscious and appeared to be drowsy."

245.    Correction Officers and an OCCF nurse took Burnett to a triage room just outside the housing unit.

246.    EMS arrived at the triage room at 8:28 a.m.

247.    Narcan was administered by EMS, but it was too late. Burnett "lost the pulse before the second dose of Narcan" and died.

248.    On May 4, 2023, OCSO initiated an internal investigation into the Correction Officer who was supervising Burnett's unit the day Burnett died.

249.    OCSO substantiated a finding that the Correction Officer provided a false statement and falsified facility tour logs, which falsely indicated that he had conducted supervisory watch tours in the hour before Burnett was found experiencing an overdose in his cell.

250.    The same Correction Officer ultimately pled guilty to a criminal charge of Falsifying Business Records and was terminated from the OCSO.

### COUNT I
### 42 U.S.C. § 1983
**Fourteenth Amendment - Deliberate Indifference to Serious Medical Needs**
**(Against Defendants Nurses Johnson, Hubbell, and Goodwin**
**and the Correction Officer Defendants)**

251.    Plaintiff realleges and incorporates by reference each allegation contained in the preceding paragraphs as if the same were fully set forth herein.

252.    By reason of the foregoing, and by denying Antwan adequate medical care, failing to promptly summon medical treatment, and/or failing to provide medical treatment, Defendants Nurses Johnson, Hubbel, and Goodwin, and the Correction Officer Defendants acted with deliberate indifference to Antwan's serious medical needs, thereby depriving him of his rights, privileges, and immunities guaranteed to every citizen of the United States in violation of 42 U.S.C. § 1983, including but not limited to rights guaranteed by the Fourteenth Amendment to the United States Constitution.

253.    Defendants Nurses Johnson, Hubbel, and Goodwin, and the Correction Officer Defendants acted at all relevant times willfully, wantonly, maliciously, and/or with such reckless disregard of consequences as to reveal a conscious indifference to the clear risk of death or serious injury to Antwan that shocks the conscience.

254.    Defendants Nurses Johnson, Hubbel, and Goodwin, and the Correction Officer Defendants acted at all relevant times under pretense and color of state law and in their individual and official capacities as officers, agents, employees, and/or contracted personnel of Defendant County. Said acts by Defendants Nurses Johnson, Hubbel, and Goodwin, and the Correction Officer Defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers.

255.    As a direct and proximate result of Defendants Nurses Johnson, Hubbel, and Goodwin, and the Correction Officer Defendants' violations of Antwan's constitutional rights, Antwan suffered physical injuries, severe pain and suffering, emotional distress, monetary damages, and death.

## COUNT II
### 42 U.S.C. § 1983
**Fourteenth Amendment - Deliberate Indifference to Serious Medical Needs**
**(Against Defendants Nurses Johnson, Dubina, and Manno)**

256.    Plaintiff realleges and incorporates by reference each allegation contained in the preceding paragraphs as if the same were fully set forth herein.

257.    By reason of the foregoing, and by denying Antwan adequate medical and mental health care, failing to provide medical treatment, and/or exhibiting deliberate indifference to Antwan's serious medical needs while his mental health condition deteriorated in the OCCF Constant Supervision Unit from January 29 to February 12, 2024, Defendants Nurses Johnson, Dubina, and Manno acted with deliberate indifference to Antwan's serious medical needs,

thereby depriving him of his rights, privileges, and immunities guaranteed to every citizen of the United States in violation of 42 U.S.C. § 1983, including but not limited to rights guaranteed by the Fourteenth Amendment to the United States Constitution.

258.     Defendants Nurses Johnson, Dubina, and Manno acted at all relevant times willfully, wantonly, maliciously, and/or with such reckless disregard of consequences as to reveal a conscious indifference to the clear risk of death or serious injury to Antwan that shocks the conscience.

259.     Defendants Nurses Johnson, Dubina, and Manno acted at all relevant times under pretense and color of state law and in their individual and official capacities as officers, agents, employees, and/or contracted personnel of Defendant County. Said acts by Defendants Nurses Johnson, Dubina, and Manno were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers.

260.     As a direct and proximate result of Defendants Nurses Johnson, Dubina, and Manno's violations of Antwan's constitutional rights, Antwan suffered physical injuries, severe pain and suffering, emotional distress, and monetary damages.

<u>**COUNT III**</u>
**42 U.S.C. § 1983**
**Municipal Liability Pursuant to *Monell***
**(Against Defendant Oneida County)**

261.      Plaintiff realleges and incorporates by reference each allegation contained in the preceding paragraphs as if the same were fully set forth herein.

262.     At the time of Anwan's death, the Defendant County had a practice of failing to immediately provide emergency medical care to incarcerated individuals experiencing a medical emergency, including individuals who are unresponsive, unconscious, experiencing a drug overdose, in respiratory failure, or experiencing cardiac arrest.

263.    This County practice was so persistent and widespread that it constituted a custom or usage and implied the constructive knowledge of policy-making officials.

264.    In addition, at the time of Antwan's incarceration and death in OCCF custody, Defendant County was deliberately indifferent to the constitutional rights of individuals incarcerated at OCCF.

265.    Defendant County exhibited deliberate indifference to the constitutional rights of individuals incarcerated at OCCF by, among other things: (a) failing to supervise County officers, agents, employees, and/or contracted personnel, including Wellpath LLC medical personnel, who were responsible for treating or responding to the serious medical needs of incarcerated people; and (b) failing to train County officers, agents, employees, and/or contracted personnel, including Wellpath LLC medical personnel, to provide appropriate emergency medical care to incarcerated people with serious medical needs, including incarcerated people experiencing life-threatening medical emergencies.

266.    The County's deliberate indifference towards the constitutional rights of individuals incarcerated at OCCF constituted a municipal and corporate policy, custom, or practice.

267.    Defendant County's custom, policy, or practice was a direct and proximate cause of Antwan's mistreatment and death, and Plaintiff's resultant damages, hereinbefore alleged.

268.    By acting with deliberate indifference to the constitutional rights of individuals incarcerated at OCCF, the County deprived Antwan of his rights, privileges, and immunities guaranteed to every citizen of the United States in violation of 42 U.S.C. § 1983, including but not limited to rights guaranteed by the Fourteenth Amendment to the United States Constitution.

<u>COUNT IV</u>
**Common Law Negligence**
**(Against All Defendants)**

269.     Plaintiff realleges and incorporates by reference each allegation contained in the preceding paragraphs as if the same were fully set forth herein.

270.     At all relevant times, the County, through its officers, agents, employees, and/or contracted personnel, including Wellpath LLC medical personnel, owed a duty to Antwan to meet the standard of care owed to incarcerated people. The standard of care required, among other things, immediate treatment of Antwan's mental health crisis and subsequent emergency medical condition.

271.     At all times relevant to this Complaint, the Correctional Officer and Medical Defendants failed to uphold this duty to Antwan.

272.     By failing to promptly call for medical assistance, failing to promptly summon EMS, and/or failing to provide prompt emergency medical treatment, the Correction Officer Defendants and Medical Defendants demonstrated a complete disregard for Antwan's life and safety, and thereby breached the duty of care owed to Antwan.

273.     The actions of the Correction Officer Defendants and Medical Defendants represent a gross deviation from the actions a reasonable individual would have taken in their position, given their knowledge and employment.

274.     The Correction Officer Defendants were at all times relevant to this Complaint acting in their capacities as County officers and employees, and within the scope and course of their employment by the County.

275.    The Medical Defendants were at all times relevant to this Complaint acting in their capacities as County employees or contractors retained by the County to provide medical care to all individuals incarcerated in the care and custody of OCCF, including Antwan.

276.    A private employer would otherwise be liable for the negligence of the Correction Officer Defendants. The County is therefore liable for the Correction Officer Defendants' negligence under the doctrine of *respondeat superior*.

277.    Wellpath, as the employer of some or all of the Medical Defendants, is responsible for their negligence under the doctrine of *respondeat superior*.

278.    The County is also responsible for Wellpath's and the Medical Defendants' negligence because it retained them to perform services that the County had undertaken to perform and was under a special, non-delegable duty and legal obligation to perform.

279.    Defendants' breach of their duty of care was a proximate cause of and substantial factor in Antwan's serious and unnecessary injuries, including severe pain and suffering, emotional distress, monetary damages, and death.

### COUNT V
**Medical Malpractice**
**(Against Defendant County, Defendant NYCCMS, Defendant Wellpath Trust, and the Medical Defendants)**

280.    Plaintiff realleges and incorporates by reference each allegation contained in the preceding paragraphs as if the same were fully set forth herein.

281.    At all times relevant to this Complaint, the County undertook to provide medical and mental health care to individuals incarcerated at OCCF, including Antwan, and it was legally obligated and had a special, non-delegable duty to do so effectively.

282.    The Medical Defendants, NYCCSMS, and Wellpath LLC were employed, retained, and/or contracted by the County to provide medical care to all individuals incarcerated at OCCF, including Antwan.

283.    The Medical Defendants, NYCCSMS, and Wellpath LLC held themselves out as possessing the proper degree of learning and skill necessary to render medical care, treatment, and services in accordance with good and accepted medical practice, and as undertaking to use reasonable care and diligence in the care and treatment of individuals incarcerated at OCCF, including Antwan.

284.    The Medical Defendants, NYCCSMS, and Wellpath LLC were negligent and careless, acted contrary to sound medical practice, and committed acts of medical malpractice against Antwan.

285.    NYCCSMS, as employer of some or all of the Medical Defendants, is responsible for their negligence and wrongdoing under the doctrine of *respondeat superior*.

286.    Wellpath LLC, through Defendant Wellpath Trust, as employer of some or all of the Medical Defendants, is responsible for their negligence and wrongdoing under the doctrine of *respondeat superior*.

287.    Defendant County is also responsible for the Medical Defendants' and NYCCSMS and Wellpath LLC's negligence and wrongdoing being it retained them to perform services that the County had undertaken to perform and was under a special, non-delegable duty and legal obligation to perform.

288.    As a result of Defendants' medical malpractice, negligence, carelessness, and unskillfulness, Antwan suffered physical injury, severe pain and suffering, emotional distress, monetary damages, and death.

## COUNT VI
### Wrongful Death
### (Against Defendants Nurses Johnson, Hubbell, and Goodwin
### and the Correction Officer Defendants)

289.     Plaintiff realleges and incorporates by reference each allegation contained in the

preceding paragraphs as if the same were fully set forth herein.

290.     As a direct and proximate result of Defendants' acts and omissions detailed

above, the statutory distributees of Antwan's estate sustained pecuniary and non-economic loss

resulting from the loss of Antwan's love, comfort, society, attention, services, income, support,

and life. Defendants are liable for the wrongful death of Antwan.

291.     As a direct and proximate result of Defendants' acts and omissions detailed

above, Antwan suffered physical injury, severe pain and suffering, emotional distress, monetary

damages, and death.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment against Defendants as follows:

1.  An award of compensatory damages in an amount to be determined at trial for Antwan's injuries;

2.  An award of compensatory damages in an amount to be determined at trial to account for Antwan's loss of life and pain and suffering;

3.  An award of compensatory damages to account for Antwan's death;

4.  An award of compensatory damages to account for Antwan's lifetime lost earnings;

5.  An award of punitive damages;

6.  An award to Plaintiff of reasonable attorney's fees and costs, interest, and disbursements under 42 U.S.C. § 1988; and

7.  Such other and further relief as the Court may deem just and proper.

Dated:  November 17, 2025
         New York, New York

                              EMERY CELLI BRINCKERHOFF
                              ABADY WARD & MAAZEL LLP

                              *Katherine Rosenfeld*

                              Katherine Rosenfeld
                              Julia P. Kuan
                              Nick Bourland

                              One Rockefeller Plaza, 8th Floor
                              New York, New York 10020
                              (212) 763-5000
                              krosenfeld@ecbawm.com
                              jkuan@ecbawm.com
                              nbourland@ecbawm.com

                              *Attorneys for Plaintiff Terry Watson*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

TERRY WATSON as Administrator of the Estate
of Antwan Cater,

                        *Plaintiff*,

    -*against*-

ONEIDA COUNTY; NEW YORK CORRECT
CARE SOLUTIONS MEDICAL SERVICES,
P.C.; WELLPATH LIQUIDATING TRUST;
JASON JOHNSON, R.N.; CONNIE HUBBELL,
R.N.; CELIA GOODWIN, R.N.; NICHOLAS
DUBINA, R.N.; PETER MANNO, R.N.;
CORRECTION OFFICER J. BRACO
DIZDAREVIC; CORRECTION OFFICER
JOSEPH HERRINGSHAW; CORRECTION
OFFICER BRADLEE CHAPMAN;
CORRECTION OFFICER BARRY BRAY; and
CORRECTION OFFICER JASON SILIPO.

                     *Defendants*.

**CERTIFICATE OF MERIT**

        NICK BOURLAND, an attorney duly admitted to practice law before the courts of the

State of New York, hereby affirms, pursuant to CPLR 3012-a, as follows:

        1.      I am an attorney at the law firm of Emery Celli Brinckerhoff Abady Ward &

Maazel LLP and counsel for Plaintiff Terry Watson, as Administrator of the Estate of Antwan

Cater, in the above-captioned action.

        2.      I have secured records relating to the death of Antwan Cater, including records

from the Oneida County Correctional Facility, where Mr. Cater was incarcerated at the time of

his death, and the Onondaga County Medical Examiner's Office, which conducted an autopsy of

Mr. Cater. I have reviewed the facts of this case and have consulted with at least one physician

who is licensed to practice in this state, or any other state, and I reasonably believe that said

physician is knowledgeable as to the relevant issues involved in this particular action, and I have

1

concluded on the basis of such review and consultation that there is a reasonable basis for

commencement of this action.

Dated: November 17, 2025
      New York, New York

EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP

Nick Bourland
*Attorney for Plaintiff*
