**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

TERRY WATSON as Administrator
of the Estate of Antwan Cater,

              Plaintiff,

        -v-                                  9:25-CV-1601 (AJB/DJS)

ONEIDA COUNTY, *et al.*,

              Defendants.

_____

**Hon. Anthony Brindisi, U.S. District Judge:**

## DECISION and ORDER

### I.     INTRODUCTION

On November 17, 2025, plaintiff Terry Watson ("plaintiff"), as administrator of the estate of his deceased son, Antwan Cater ("decedent"), filed this civil rights and wrongful death action alleging that defendants failed to provide constitutionally adequate medical care to decedent while he was a pretrial detainee at the Oneida County Correctional Facility ("OCCF").

Specifically, plaintiff alleges that on February 13, 2024, OCCF correction officers J. Braco Dizdarevic, Bradlee Chapman, Barry Bray, Jason Silipo, and Joseph Herringshaw and five medical staff members responsible for providing care to detainees at the facility observed decedent experiencing a seizure but failed to provide timely life-saving measures, including the prompt initiation of CPR, resulting in his death.  Dkt. No. 1 ("Compl.").  Plaintiff's six-count complaint initially asserted claims under 42 U.S.C. § 1983 against correction officers J. Braco Dizdarevic, Bradlee Chapman, Barry Bray, Jason Silipo, and Joseph Herringshaw; medical staff Jason Johnson, Connie Hubbel, Celia Goodwin, Nicholas Dubina, and Peter Manno (collectively,

the "medical staff defendants"); Oneida County (the "County"); New York Correct Care Solutions Medical Services, P.C. ("NYCCSMS"); and Wellpath Liquidating Trust (the "Trust"), alleging violations of decedent's Fourteenth Amendment rights based on deliberate indifference to his serious medical needs. *See generally* Compl. Plaintiff's complaint also asserted state-law claims for wrongful death, negligence, and medical malpractice. *Id*.

Thereafter, the parties stipulated to the dismissal of plaintiff's claims against Officer Herringshaw as well as his state-law claims for negligence (Count IV) and medical malpractice (Count V) against the County and the four remaining officers. Dkt. No. 30. The medical staff defendants, the Trust, and NYCCSMS have answered the complaint and asserted certain cross-claims. Dkt. Nos. 24, 36, 40, 42, 43.

On December 11, 2025, the County, Officers Chapman, Bray, and Silipo (the "CO defendants"), and Officer Dizdarevic (collectively the "moving defendants") moved to dismiss the complaint on the remaining counts pursuant to Federal Rule of Civil Procedure 12(b)(6). Dkt. No. 15.

The motion has been fully briefed, Dkt. Nos. 32, 33, 34, and will be considered on the basis of the submissions without oral argument.

## II.    BACKGROUND

The following facts are taken from plaintiff's complaint, Dkt. No. 1, and are assumed true for the purpose of assessing the moving defendants' motion to dismiss.

Antwan Cater was 25 years old at the time of his death in the custody of the County at OCCF. Compl. ¶ 1. Prior to his arrival at OCCF, on December 28, 2023, decedent was arrested for shoplifting toys from a Wal-Mart and was subsequently released to attend substance use

treatment.  *Id.* ¶¶ 52, 57.  On January 29, 2024, decedent was re-arrested and booked at OCCF after he failed to report for the treatment program.  *Id.* ¶ 58.

Decedent had a well-documented history of seizures, substance use disorder, and mental health issues, all of which he disclosed upon his admission to OCCF.  Compl. ¶¶ 58–65.  OCCF medical staff prescribed decedent a detox plan and placed him in the Constant Supervision Unit (the "CSU").  *Id.* ¶ 66.  During the period after his arrival at OCCF, decedent's condition visibly deteriorated: he became disoriented, nonverbal, and erratic, and he exhibited alarming behavior including crying, shouting, and physical distress.  *Id.* ¶¶ 68, 72–74, 79, 84, 89–95.

Just before noon on February 13, 2024, decedent was transferred from the CSU to the General Population Medical Infirmary in advance of a court appearance scheduled for that day.  Compl. ¶¶ 98, 99.  At approximately 12:50 p.m., Correction Officer Dizdarevic observed decedent "laying flat on the floor [of his cell] but breathing and turning his head from side to side with his eyes open," appearing to experience a seizure.  *Id.* ¶ 111.  Officer Dizdarevic "walked down the hall to the medical unit to report what he had seen" but did not enter the cell or otherwise provide medical assistance to decedent at that time.  *Id.* ¶¶ 114–15.  Officer Dizdarevic returned to his desk.  *Id.* ¶ 115.

Approximately eight minutes later, around 12:58 p.m., Officer Dizdarevic returned to the cell accompanied by Correction Officers Chapman, Bray, and Silipo.  Compl. ¶¶ 117–19.  The officers arrived with a restraint chair, which they intended to use to remove decedent from his cell and transport him to court.  *Id.* ¶ 117.  Upon entering the cell, at 12:58:17, the officers observed decedent lying on his back, unresponsive.  *Id.* ¶¶ 120–22.  More than 40 seconds later, at 12:58:59, the officers called for medical assistance from Nurse Jason Johnson.  *Id.* ¶¶ 128–29.

Officer Chapman requested that someone "grab some smelling salt." *Id.* ¶ 130.  CPR was not initiated at that time.  *Id.* ¶ 135.

Medical staff, including Nurse Johnson, arrived at decedent's cell at 12:59:48.  *Id.* ¶ 136. Upon arrival, medical personnel assessed decedent before initiating resuscitative measures.  *Id.* ¶¶ 137–41, 144–76. Nurse Johnson reported that, at approximately 1:00:52, he "checked for [decedent's] carotid pulse and determined that [decedent's] 'pulse was weak but present' and that he felt decedent 'swallow.'"  *Id.* ¶¶ 148–49.  At 1:02:50, Nurse Johnson stated: "I can't hear a pulse, I can't hear anything."  *Id.* ¶ 164.  Medical personnel did not initiate CPR until approximately 1:04 p.m.—fourteen minutes after Officer Dizdarevic first observed decedent lying on the floor of the cell.  *Id.* ¶ 181.  Emergency efforts continued, but decedent was later pronounced dead at approximately 1:44 p.m.  *See generally id.* ¶¶ 180–206.

In their respective incident reports, each of the correction officer defendants provided a consistent *post hoc* justification for their failure to obtain or render immediate medical aid, namely, that they believed decedent was feigning a seizure to avoid appearing in court later that day.  *See* Compl. ¶¶ 211–14.

After reviewing the circumstances of decedent's death, the Medical Review Board of the New York State Commission on Correction ("COC") found "significant issues with the medical response and resuscitation measures provided to [decedent]," including delays in initiating resuscitation, activating EMS, and administering Narcan.  *Id.* ¶¶ 232–36.  The COC also concluded that medical staff appeared unprepared to respond to an unresponsive individual, noting that resuscitation equipment was not brought to the scene until nearly five minutes after decedent was found unresponsive, and directed a comprehensive review and retraining of CPR and emergency response procedures.  *Id.* ¶¶ 236–39.

But according to plaintiff, decedent was not the first OCCF detainee who died after receiving deficient medical care at the facility.  On April 27, 2023, 25-year-old Milik Burnett died of an accidental fentanyl overdose in OCCF custody after OCCF allegedly failed to respond to his medical emergency.  *See* Compl. ¶ 242.  After Burnett's death, the County Sheriff's Office initiated an internal investigation and found that a corrections officer failed to conduct supervisory watch tours of Burnett's dorm in the hour before Burnett was found unresponsive. *Id.* ¶ 249.

## III.    LEGAL STANDARDS

The Federal Rules of Civil Procedure permit a party to move to dismiss a pleading for "failure to state a claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6).  To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*.

Although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (cleaned up).  While "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *Iqbal*, 556 U.S. at 678, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  *Id.*

To assess this facial plausibility requirement, the court "must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and draw all reasonable inferences in favor of the plaintiff, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). In doing so, the court generally confines itself to the facts alleged in the pleading, documents attached to the complaint or incorporated into it by reference, and matters of which judicial notice may be taken. *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016).

## IV.    DISCUSSION

Plaintiff has withdrawn his common law negligence (Count IV) and medical malpractice (Count V) claims against the moving defendants. *See* Dkt. No. 30. Counts II (Fourteenth Amendment deliberate indifference), IV (common law negligence), and V (medical malpractice) are alleged as to the non-moving defendants and will not be addressed here.

On December 11, 2025, the moving defendants moved to dismiss Counts I, III, and VI of the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that plaintiff failed to state a claim of deliberate indifference to serious medical needs under the Fourteenth Amendment and failed to plausibly allege municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978). Dkt. No. 15. Plaintiff opposed the motion, arguing that the complaint plausibly alleges a constitutionally deficient response to a serious medical emergency and sufficiently pleads both individual and municipal liability. Dkt. No. 32.

### A.    Deliberate Indifference Claim (Count I)

Plaintiff alleges deliberate indifference claims against "(1) CO Dizdarevic with respect to his failure to do anything to help [decedent] for eight minutes after he reported the seizure to

Nurse Johnson; and (2) all of the CO [d]efendants due to their failure to attempt any resuscitation measures after they found [decedent] unresponsive." Dkt. No. 32 ("Pl.'s Mem.") at 7.[1]

The Eighth Amendment of the Constitution "prohibits the infliction of 'cruel and unusual punishments' on persons *convicted* of crimes." *Lara-Grimaldi v. Cnty. of Putnam*, 132 F.4th 614, 630 (2d Cir. 2025) (quoting U.S. Const. amend. VIII) (emphasis added). But pretrial detainees, like decedent, *see* Compl. ¶ 2, "have not been convicted of a crime and thus may not be punished in any manner—neither cruelly and unusually nor otherwise." *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (quoting *Iqbal v. Hasty*, 490 F.3d 143, 168 (2d Cir. 2007)) (citation modified). Accordingly, "'the relevant constitutional provision' governing a state's responsibility to care for persons in its custody who are not prisoners, such as . . . pretrial detainees, . . . 'is not the Eighth Amendment but is, instead, the Due Process Clause of the Fourteenth Amendment.'" *Lara-Grimaldi*, 132 F.4th at 631 (quoting *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)). A pretrial detainee's rights are "at least as great as the Eighth Amendment protections available to a convicted prisoner." *Lara-Grimaldi*, 132 F.4th at 631 (quoting *City of Revere*, 463 U.S. at 244).

To establish a § 1983 claim for deliberate indifference to medical needs in the Fourteenth Amendment context, the plaintiff must show that: (1) he or she had a "serious medical need"; and (2) the defendant "acted with deliberate indifference." *Charles v. Orange Cnty.*, 925 F.3d 73, 86 (2d Cir. 2019) (citations omitted). The first prong is objective, requiring the detainee to allege "a condition of urgency such as one that may produce death, degeneration, or extreme pain." *Id*. (citing *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)). The second prong, also objective in nature, requires a showing that the defendant "recklessly failed to act with

---

[1] Pagination corresponds with CM/ECF headers.

reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35.

Defendants argue that this claim must be dismissed because plaintiff has failed to plausibly allege the second element of this claim, *i.e.*, that they acted with deliberate indifference. In defendants' view, "[b]y promptly notifying medical staff, CO Dizdarevic acted with reasonable care under the circumstances" and that "[b]y promptly calling for medical assistance upon discovering the decedent's condition, [the CO defendants] acted reasonably to address the medical emergency." Dkt. No. 15-1 ("Defs.' Mem.") at 17.

This argument will be rejected. As an initial matter, the first element of this § 1983 deliberate indifference to serious medical needs claim—whether the alleged deprivation of adequate medical care is objectively "sufficiently serious," *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (cleaned up), is plainly properly pled. As plaintiff notes, because "defendants have not challenged the seriousness of the alleged deprivation of medical care, the Court should assume the first prong of the deliberate indifference claim was properly pled." Pl.'s Mem. at 14 (quoting *Maldonado v. Town of Greenburgh*, 460 F. Supp. 3d 382, 396 (S.D.N.Y. 2020)) (cleaned up).

The Court agrees. But even if defendants had challenged the gravity of the deprivation of medical care at issue, plaintiff plausibly alleges that the decedent "was unconscious, not breathing, and ultimately died" when the CO defendants and Officer Dizdarevic entered decedent's cell, *id.* (quoting *Maldonado*, 460 F. Supp. at 396), circumstances which plainly represent "a condition of urgency that may result in degeneration or extreme pain." *Id.* (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)); *Jackson v. Johnson*, 118 F. Supp. 2d

- 8 -

278, 291 (N.D.N.Y. 2000) (Hurd, J.) (characterizing "loss of consciousness and unresponsiveness" as "serious medical issues").

With respect to the second prong, plaintiff has sufficiently alleged that defendants knew or should have known that failing to render appropriate medical care would result in a substantial risk to decedent's health. Of course, mere negligence is insufficient to establish deliberate indifference. *See, e.g., Tutora v. Correct Care Sols.*, 2019 WL 1383646, at *6 (S.D.N.Y. Mar. 27, 2019) (collecting cases); *Miller v. Cnty. of Nassau*, 2018 WL 1597401, at *3 (E.D.N.Y. Mar. 31, 2018). Likewise, disagreements over medical judgment, without more, do not rise to the level of a constitutional violation. *See Crouch v. Spaulding*, 2019 WL 1004539, at *4 (N.D.N.Y. Jan. 24, 2019), *report and recommendation adopted*, 2019 WL 1004357 (N.D.N.Y. Mar. 1, 2019).

Rather, a pretrial detainee must show either that "the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the [ ] detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35; *Dumel v. Westchester Cnty.*, 656 F. Supp. 3d 454, 465 (S.D.N.Y. 2023) (explaining this plaintiff-friendly standard is "akin to objective recklessness").

As relevant here, "[a] claim of an unconstitutional delay or interruption in treatment is only cognizable if it 'reflects deliberate indifference to a serious risk of health or safety, to a life-threatening or fast-degenerating condition[,] or to some other condition of extreme pain that might be alleviated through reasonably prompt treatment.'" *Case v. Anderson*, 2017 WL 3701863, at *8 (S.D.N.Y. Aug. 25, 2017) (quoting *Amaker v. Coombe*, 2002 WL 523388, at *8 (S.D.N.Y. Mar. 29, 2002)). In assessing such claims, courts consider "the particular risk of harm faced by" a detainee, including the seriousness of the medical need, whether the delay worsened

the condition, and the reasons for the delay.  *Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003).

Applying these principles, plaintiff has plausibly alleged that the CO defendants and Officer Dizdarevic recklessly failed to act with reasonable care in the face of a serious and, importantly, *obvious* medical emergency.  For one, plaintiff plausibly alleged that decedent had a recorded history of mental illness, and his recent psychological deterioration was well-documented.  Compl. ¶¶ 53–56, 71, 74, 84, 89–95.  The complaint also plausibly alleges that decedent was observed experiencing a presumptive seizure, left without intervention for several minutes, and later found unresponsive, yet no resuscitative measures were initiated by the officers present. *Id.* ¶¶ 111, 115, 120–35.

As to Officer Dizdarevic, plaintiff alleges that, after personally observing decedent experiencing a presumptive medical emergency, he failed to take any action to assist decedent for approximately eight minutes (save for his trip to alert the medical unit).  *See* Pl.'s Mem. at 7.  A delay in providing medical care may constitute deliberate indifference where it involves a life-threatening or rapidly deteriorating condition and reflects a failure to act with reasonable care. *See Carpenter*, 316 F.3d at 186; *Case*, 2017 WL 3701863, at *8.  Here, plaintiff plausibly alleges that decedent was experiencing a visible, acute medical emergency and that prompt intervention was required.

Officer Dizdarevic not only had reason to understand that decedent was suffering from a serious medical emergency requiring prompt attention, but the surrounding circumstances also support the inference that he was actually aware of the urgency of decedent's condition.  Indeed, upon observing decedent seizing, Officer Dizdarevic immediately proceeded to the medical unit to report what he had just witnessed.  Compl. ¶¶ 112–13.  But after proceeding to the medical

unit, Officer Dizdarevic returned to his desk without rendering assistance to decedent. *Id.* ¶¶ 114–15. At this stage, the alleged delay—viewed in light of the severity and obviousness of the condition—is sufficient to support an inference that Officer Dizdarevic "recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the [ ] detainee even though [he] knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35.

As for the remaining correction officer defendants, plaintiff alleges that, upon discovering decedent unresponsive and not breathing, the officers failed to initiate any resuscitative measures. Compl. ¶¶ 120–35. Unlike cases involving delayed or disputed treatment, the alleged conduct here involves a complete failure to act in the face of a readily apparent medical emergency. At the pleadings stage, plaintiff's allegations are sufficient to support an inference that the CO defendants knew or should have known that decedent faced an excessive risk to his health and failed to take reasonable steps to mitigate that risk. *See McRaven v. Sanders*, 577 F.3d 974, 983 (8th Cir. 2009) (affirming denial of qualified immunity to officer who was trained in CPR but failed to perform it on a pre-trial detainee manifestly in need of it); *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1083 (9th Cir. 2013) (reversing award of summary judgment where officers "did not fail to provide CPR because they were busy with other tasks . . . [i]nstead, they allegedly took no life saving action while waiting for [medical staff] to arrive.").[2]

Indeed, while it is plausible to infer that the CO defendants were aware of a substantial risk to decedent's health, the Court need not resort to inference on this knowledge element. As plaintiff notes, the CO defendants were all required to be trained in CPR and first aid. *See* Pl.'s

---

[2] Although *McRaven* and *Lemire* involved Eighth Amendment claims, rather than claims arising under the Fourteenth Amendment, their reasoning applies here. *See Darnell*, 849 F.3d at 29 (explaining that "[a] detainee's rights are at least as great as the Eighth Amendment protections available to a convicted prisoner.") (quoting *City of Revere*, 463 U.S. at 244) (internal quotations omitted).

Mem. at 13; 9 N.Y.C.R.R. §§ 6018.2(a)–(b); N.Y. Exec. Law § 837-a(9).[3]  Further, OCCF staff were aware of decedent's "daily use of K2 and history of K2 withdrawal."  Compl. ¶ 210.

Defendants, for their part, assert that they did not seek or render immediate aid because they believed decedent was feigning a medical emergency to avoid a court appearance scheduled for later that day.  *See* Compl. ¶¶ 211–14.  At this stage, however, that asserted belief does not defeat plaintiff's claim.  Even assuming defendants initially questioned the legitimacy of decedent's condition, an officer may not disregard an objectively serious medical need based on a subjective assumption that the detainee is exaggerating or feigning symptoms.  *See Farmer*, 511 U.S. at 842 (officials may not avoid liability by declining to verify a risk they strongly suspect to exist); *Jackson*, 118 F. Supp. 2d at 291 (characterizing defendant's "attempt to justify her actions by claiming that [plaintiff] was feigning injury to gain attention" as "troubling" when plaintiff "exhibited numerous symptoms and physical manifestations of a serious medical condition").  Where, as alleged here, a detainee exhibited signs of a life-threatening medical emergency, a belief that the detainee was "playing possum," Compl. ¶ 214, does not preclude a finding of deliberate indifference at the pleading stage.

Further, defendants' contention that they acted reasonably by summoning medical assistance does not, at this stage, foreclose liability where plaintiff alleges that no immediate steps were taken to address an urgent and deteriorating condition.  *Cf. Jackson*, 118 F. Supp. 2d at 291 ("[Defendants] cannot absolve themselves of responsibility for their actions merely by passing the blame to . . . [medical staff].  If they thought that [the plaintiff] was in medical distress, they should have acted upon that perception.").

---

[3] N.Y. State Division of Criminal Justice Services, "Basic Course for Correction Officers Administrator's Guide," (May 2016), https://www.criminaljustice.ny.gov/ops/docs/training/pubs/basicpeace/basiccoursecorrectionsofficersadminguide.pdf.

Lastly, given the alleged facts, defendants' reliance on *Fessette v. Schroyer*, 2015 WL 7283189 (N.D.N.Y. 2015), is misplaced. *See* Dkt. No. 34 ("Defs.' Reply Mem.") at 4–5. That case involved a "seventeen hour delay" in rendering pain medication to an inmate after the inmate fell and injured himself in the shower. *See Fessette*, 2015 WL 7283189, at *3. As the *Fessette* court noted, "[i]f officials . . . ignore[] a 'life threatening and fast-degenerating' condition, the delay may constitute deliberate indifference." *Id*. (citing *Demata v. N.Y. State Corr. Dep't of Health Servs.*, 198 F.3d 233 (2d Cir. 1999)).

Unlike the non-life-threatening injury at issue in *Fessette*, plaintiff has plausibly alleged that decedent was experiencing an acute medical emergency—namely, a seizure followed by unresponsiveness and cessation of breathing—conditions that plainly qualify as life-threatening and rapidly deteriorating. Accordingly, the alleged delay in initiating life-saving measures falls squarely within the category of conduct that courts have recognized as potentially constituting deliberate indifference.

Taken together, plaintiff's allegations plausibly support the conclusion that the CO defendants and Officer Dizdarevic were equipped to recognize a medical emergency—including an unresponsive detainee—and understood the need for prompt intervention, including the initiation of CPR. *See McRaven*, 577 F.3d at 983 ("An officer trained in CPR, who fails to perform it on a prisoner manifestly in need of such assistance, is liable under § 1983 for deliberate indifference."). Accordingly, the Court concludes that plaintiff has adequately stated a claim for deliberate indifference to medical needs against the CO defendants and Officer Dizdarevic.

**B.**     *Monell* **Liability** (Count III)

Plaintiff advances two theories of municipal liability against the County: "(1) [the County's] widespread practice or custom of failing to provide immediate emergency medical treatment in response to detainees' medical emergencies; and (2) [the County's] deliberate indifference to its failure to train COs and medical staff to immediately administer CPR to individuals who are unresponsive[.]"  Pl.'s Mem. at 21; Compl. ¶ 262.

Municipalities cannot be held vicariously liable for the acts of their employees under 42 U.S.C. § 1983; rather, municipalities may be held liable only when "execution of a government's policy or custom" causes a constitutional violation.  *Monell*, 436 U.S. at 694.  Accordingly, to state a claim for municipal liability, a plaintiff must plausibly allege "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right."  *Torraco v. Port Auth. of N.Y. & N.J.*, 615 F.3d 129, 140 (2d Cir. 2010) (citations omitted); *see id.* at 694–95.

To prevail on a *Monell* claim, a plaintiff must also show "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation."  *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).  Thus, a municipality is not liable "for an injury inflicted solely by its employees or agents;" rather, liability attaches only when the municipality itself, through the execution of its policies or customs, is the "moving force" behind the constitutional violation.  *Monell*, 436 U.S. at 694.  This requirement ensures that a plaintiff identifies conduct attributable to the municipality itself, rather than merely relying on the actions of individual employees.  *See Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 390 (S.D.N.Y. 2013).

A plaintiff may demonstrate the existence of a municipal "policy or custom" in several ways, including by alleging: (1) a formally adopted policy; (2) actions taken by government

officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure to train or supervise subordinates that amounts to deliberate indifference to the rights of those who come into contact with municipal employees. *See, e.g.*, *Davis v. City of New York*, 2018 WL 10070540, at *4 (S.D.N.Y. Mar. 30, 2018).

The County contends that plaintiff's *Monell* claim must be dismissed because the complaint "does not plausibly allege that the County maintained an official policy, custom, or practice that caused the alleged constitutional violations" since the "sole prior incident cited by the plaintiff is insufficient to establish a widespread and persistent custom" and, further, that "plaintiff's conclusory allegations of deliberate indifference by County policymakers lack factual support." Defs.' Mem. at 19–20.

These arguments are rejected. At the pleadings stage, a *Monell* claim will survive a motion to dismiss if a plaintiff "make[s] factual allegations that support a plausible inference that the constitutional violation took place pursuant to either a formal course of action officially promulgated by the municipality's governing authority or the act of a person with policy making authority for the municipality." *Acosta v. City of New York*, 2012 WL 1506954, at *11 (S.D.N.Y. Apr. 26, 2012) (quoting *Missel v. Cnty. of Monroe*, 351 F. App'x 543, 545 (2d Cir. 2009) (summary order)). "The policy or custom need not be memorialized in a specific rule or regulation," *Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996), and may be "reflected in either action or inaction," *Cash v. Cnty. of Erie*, 654 F.3d 324, 341–42 (2d Cir. 2011).

Measured against this general legal standard, plaintiff's factual allegations are sufficient to plausibly plead a *Monell* claim against the County.

To be sure, "isolated acts [] by non-policymaking municipal employees are generally not sufficient to demonstrate a municipal custom, policy, or usage that would justify municipal liability," but "such acts would justify liability of the municipality if, for example, they were done pursuant to municipal policy, or were sufficiently widespread and persistent to support a finding that they constituted a custom, policy, or usage of which supervisory authorities must have been aware, or if a municipal custom, policy, or usage would be inferred from evidence of deliberate indifference of supervisory officials to such abuses." *Jones v. Town of East Haven*, 691 F.3d 72, 81 (2d Cir. 2012) (citing *Villante v. Dep't of Corr.*, 786 F.2d 516, 519 (2d Cir. 1986)).

Here, plaintiff alleges a pattern of similar conduct—namely, at least one other recent instance involving alleged failures by OCCF staff to provide timely and adequate emergency medical care to a detainee experiencing a serious medical event involving a suspected drug overdose. *See* Compl. ¶¶ 242–50. The complaint also references post-incident findings by the COC Medical Review Board documenting "significant issues" in the emergency response to decedent's medical crisis, including delays in initiating resuscitation, activating EMS, and administering Narcan, as well as concerns that staff were unprepared to respond to an unresponsive individual. *See* Compl. ¶¶ 232–39. At the motion to dismiss stage, these allegations, taken together, support a plausible inference that the challenged conduct was not merely isolated or aberrational, but instead reflective of a recurring practice of delayed or inadequate responses to medical emergencies at OCCF.

Defendants attempt to discount the Burnett incident because it has not resulted in an "adjudicated constitutional violation." *See* Defs.' Reply Mem. at 6. This argument misunderstands the pleading standard for a *Monell* claim. There is no requirement that

comparator incidents be reduced to judgment or even fully litigated.  Courts may consider unadjudicated prior incidents, complaints, internal investigations, and other evidence of similar conduct at the pleading stage.  *See, e.g., Outlaw v. City of Hartford*, 884 F.3d 351, 380 (2d Cir. 2018) ("*Monell* liability, by its nature, will often turn on evidence concerning victims other than the plaintiffs and alleged misfeasors other than the individual defendants"); *Kern*, 93 F.3d at 44 (noting that "persistent and widespread" practices of city officials may constitute a municipal custom) (quoting *Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 870–71 (2d Cir. 1992)); *Colon v. City of Rochester*, 419 F.Supp.3d 586, 605 (W.D.N.Y. 2019) ("The question on a motion to dismiss is whether, assuming the truth of the plaintiffs' factual allegations, those past incidents give rise to a plausible claim of deliberate indifference on the part of the municipality to the types of constitutional violations alleged in the case before the court.").

The cases defendants cite in support of their argument stand for a narrower proposition, namely, that a plaintiff cannot establish *Monell* liability merely by citing to a handful of filed lawsuits, and that speculative or conclusory allegations of a "policy" are insufficient.  *See Roman v. City of Mount Vernon*, 2022 WL 2819459, at *20 (S.D.N.Y. July 29, 2022) ("[C]ourts in this district have consistently held that 'citations to lawsuits, even if they did involve comparable conduct, do not *alone* establish a custom or practice that is widespread and persistent, particularly if the lawsuits did not result in an adjudication of liability.'" (citing *Bethune v. Westchester County*, 2020 WL 1032508, at *5 (S.D.N.Y. Mar. 2, 2020)) (emphasis added).  Here, plaintiff offers more than a bare recitation of case citations; the complaint alleges a specific, recent, and factually developed prior incident involving OCCF's alleged failure to respond to a detainee's overdose emergency, as well as contemporaneous findings by the COC Medical Review Board with respect to decedent's death.  Whether those incidents ultimately give rise to

liability is a merits question, and their relevance to plausibility is not contingent on a prior

judicial finding of constitutional wrongdoing.  In sum, defendants' citation to cases emphasizing

the absence of prior *Monell* liability is beside the point—those decisions do not stand for the

proposition that only adjudicated constitutional violations count as predicate "incidents" for

pattern purposes.

The same pattern of alleged conduct also supports plaintiff's failure-to-train theory.  A

municipality's failure to train its employees may constitute a policy or custom where "in light of

the duties assigned to specific officers or employees the need for more or different training is so

obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the

policymakers . . . can reasonably be said to have been deliberately indifferent."  *City of Canton*,

489 U.S. at 390.  Plaintiffs may satisfy this standard, at the pleading stage, by alleging facts

suggesting "[a] pattern of similar constitutional violations by untrained [municipal] employees."

*Simms v. City of New York*, 480 F. App'x 627, 630 (2d Cir. 2012) (quoting *Connick v. Thompson*,

563 U.S. 51, 62 (2011)).  While the Court need not specify which of plaintiff's two theories of

liability (if either of them) might best support a *Monell* claim, the alleged failure to train

correction officers to respond to an unresponsive detainee—particularly where the need for

immediate action is self-evident—also supports a reasonable inference that the County's training

program was deficient and that this deficiency was a moving force behind the constitutional

violation.

"[W]hen [county] policymakers are on actual or constructive notice that a particular

omission in their training program causes [county] employees to violate citizens' constitutional

rights, the [County] may be deemed deliberately indifferent if the policymakers choose to retain

that program[.]"  *Simms*, 480 F. App'x at 630 (quoting *Connick*, 563 U.S. at 62).  Plaintiff alleges

that correction officers failed to initiate basic life-saving measures in response to an obvious medical emergency, and that similar failures have occurred in other instances, permitting the inference that the County was on notice of deficiencies in its training yet failed to take corrective action.

At the pleading stage, plaintiff is not required to prove the existence of such a policy or custom, but only to allege facts that render its existence plausible. Here, the alleged pattern of similar incidents is sufficient to nudge plaintiff's *Monell* claim "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. Accordingly, plaintiff has adequately alleged the existence of a municipal custom or practice against the County.

### C.    **Wrongful Death Claim** (Count VI)

Plaintiff alleges that "[a]s a direct and proximate result of [d]efendants' acts and omissions . . ., the statutory distributees of [decedent's] estate sustained pecuniary and non-economic loss resulting from the loss of [decedent's] love, comfort, society, attention, services, income, support, and life," Compl. ¶ 290, and, further, that "[decedent] suffered physical injury, severe pain and suffering, emotional distress, monetary damages, and death." *Id.* ¶ 291.

Under New York law, a wrongful death claim requires a plaintiff to show: (1) the death of a human being; (2) a wrongful act, neglect, or default of the defendant that caused the death; (3) the survival of distributees who suffered pecuniary loss as a result of the death; and (4) the appointment of a personal representative of the decedent's estate. *See Chong v. N.Y.C. Transit Auth.*, 83 A.D.2d 546, 547 (2d Dep't 1981). Pecuniary injuries may include "loss of support, voluntary assistance, possible inheritance, [and] medical and funeral expenses incidental to death." *Regan v Long Island R.R. Co.*, 128 A.D.2d 511, 513 (2d Dep't 1987).

In New York, wrongful death is a statutory cause of action, and recovery is limited to "fair compensation for the pecuniary injuries resulting from the decedent's death" to the distributees. *McKee v. Colt Elecs. Co.*, 849 F.2d 46, 50 (2d Cir. 1988) (citations omitted). Such damages do not include grief or loss of society, though they may encompass losses such as financial support and parental guidance. *Id.* And, under New York Law, wrongful death is a statutory cause of action that permits recovery only where the decedent could have maintained an action for the underlying wrongful conduct had he or she lived. *See Hernandez v. N.Y.C. Health & Hosps. Corp.*, 78 N.Y.2d 687, 693 (N.Y. 1991).

By contrast, where a plaintiff seeks recovery under 42 U.S.C. § 1983 for constitutional violations resulting in death, the limitations imposed by New York's wrongful death statute do not necessarily apply. *See McFadden v. Sanchez*, 710 F.2d 907, 911 (2d Cir. 1983); *Banks ex rel. Banks v. Yokemick*, 177 F. Supp. 2d 239, 249–50 (S.D.N.Y. 2001). Because § 1983 is intended to compensate for the deprivation of constitutional rights, available damages are determined by federal common-law principles and may extend beyond strictly pecuniary losses. *See Townes v. City of N.Y.*, 176 F.3d 138, 147–48 (2d Cir. 1999).

To the extent defendants challenge the wrongful death claim on procedural grounds, including alleged non-compliance with notice-of-claim requirements, the Court notes that plaintiff has withdrawn his state-law negligence and medical malpractice claims and maintains that he timely served a notice of claim with respect to the wrongful death cause of action. Dkt. No. 30; Pl.'s Mem. at 6–7; Dkt. No. 33-1, Bourland Decl. Ex. A. Although it seems likely that this cause of action is only properly asserted against the non-moving defendants (against whom plaintiff's primary state-law tort claims remain), it may be the case that this wrongful death claim has some role to play in plaintiff's § 1983 claims against the moving defendants.

Because the complaint does not clearly delineate whether count VI is brought solely pursuant to New York law or is intended to overlap with plaintiff's § 1983 claims, and because the available theories of recovery and the proper defendants on this count may depend on which other claims survive, the Court declines to resolve these questions at this stage. Accordingly, defendants' motion to dismiss count VI of the complaint is denied without prejudice to renewal. Following the close of discovery or at such earlier time as the court may direct the parties are invited to address the scope and viability of the wrongful death claim—including the interplay between New York's wrongful death statute and plaintiff's § 1983 claims—in any subsequent dispositive motion.

## V.    CONCLUSION

In sum, following the stipulation at Dkt. No. 30, plaintiff's remaining claims are: (1) Count I, alleging Fourteenth Amendment deliberate indifference claims against defendants Johnson, Hubbel, Goodwin, Dizdarevic, Chapman, Bray, and Silipo; (2) Count II, alleging Fourteenth Amendment deliberate indifference claims against defendants Johnson, Dubina, and Manno; (3) Count III, alleging a *Monell* claim against defendant Oneida County; (4) Count IV, alleging common law negligence claims against the medical staff defendants, NYCCSMS, and the Trust; (5) Count V, alleging medical malpractice claims against the medical staff defendants, NYCCSMS, and the Trust; and (6) Count VI, alleging wrongful death claims against defendants Johnson, Hubbel, Goodwin, Dizdarevic, Chapman, Bray, and Silipo.

The medical staff defendants, NYCCSMS, and the Trust have answered the complaint, while the County and CO defendants moved to dismiss Counts I, III, and VI as asserted against them. Because the motion to dismiss is denied in its entirety, those claims shall proceed to discovery, and the County and CO defendants will be directed to answer the complaint.

- 22 -

Therefore, it is

ORDERED that

1.   Defendants' motion to dismiss (Dkt. No. 15) is **DENIED**;

The Clerk of the Court is directed to terminate the pending motion and set an answer

deadline accordingly.

    **IT IS SO ORDERED.**

Dated:  May 11, 2026
      Utica, New York.

Anthony J. Brindisi
U.S. District Judge